United States District Court
Southern District of Texas
**ENTERED**
July 13, 2016
David J. Bradley, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **JAVIER ALVAREZ DEL CASTILLO**, *et al*, | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:14-CV-03435** |
| | § | |
| **PMI HOLDINGS NORTH AMERICA INC**, *et al*, | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM & ORDER

### I.      INTRODUCTION

This case arises out of an explosion at a natural gas refinery in Reynosa, Mexico that occurred in September 2012. Plaintiffs are refinery employees who were injured in the blast and the family members of employees who were killed. Defendants are variously the owners, operators, or suppliers of the plant.

Before the Court are the motions to dismiss filed by the following defendants: Rotork Controls Inc. ("Rotork USA") (Doc. No. 131); Kinder Morgan Gas Natural de Mexico, Kinder Morgan Inc., Kinder Morgan Energy Partners L.P., Kinder Morgan Management LLC, El Paso Pipeline Partners, LP, El Paso Pipeline GP Company, LLC, Tennessee Pipeline Inc., and Tennessee Pipeline Partners, Inc. (collectively, "Kinder Morgan") (Doc. No. 137); P.M.I. Comercio Internacional, S.A. de C.V. ("PMI Comercio"), P.M.I. Holdings North America, Inc. ("PMI Holdings"), and PEMEX Procurement International, Inc. ("PPI") (Doc. No. 135); Emerson Electric Co. ("Emerson Electric") (Doc. No. 138); Draeger Safety Inc. ("Draeger") (Doc. No. 139); Honeywell Analytics Inc. ("Honeywell") (Doc. Nos. 141-142); and, Petróleos Mexicanos ("Pemex"), Pemex Exploración y Producción ("PEP"), and Pemex Transformación

1

Industrial, as successor-in-interest  to Pemex Refinación ("PXR"), Pemex Gas y Petroqímica Básica ("PGPB"), and Pemex Petroqímica ("PPQ") (collectively, "Pemex Defendants") (Doc. No. 160).

For the reasons set out in this Order, the Court has determined that all of Plaintiffs' claims must be dismissed with prejudice except for the negligence and gross negligence claims against Defendant Kinder Morgan.

## II.    BACKGROUND[1]

On September 18, 2012, a large explosion at a natural gas refinery in Reynosa, Mexico fatally injured at least 22 workers and seriously injured 15 more. The Reynosa plant is owned by Defendant PEP, which is a subsidiary of Defendant Pemex. Plaintiffs allege that the explosion and resulting injuries were caused by Defendants' negligence in the design, construction, and operation of the plant, the plant's safety measures, and the natural gas pipelines.

Plaintiffs originally filed their First Amended Petition in Texas state court in September 2014. Plaintiffs later filed in state court a Second Amended Petition. In December 2014, the case was removed to federal court. After removal, a number of Defendants filed motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. On June 22, 2015, the Court granted, without prejudice, the Rule 12(b)(6) motions to dismiss Plaintiffs' Second Amended Petition. *See* Mem. & Order, June 22, 2015 (Doc. No. 61). On July 16, 2015, Plaintiffs filed their Third Amended Complaint, which prompted the filing of new Rule 12(b)(6) motions by Defendants. On October 22, 2015, the Court granted Plaintiffs leave to file their Fourth Amended Complaint (the "Complaint") (Doc. No. 130). In response to the Fourth Amended Complaint, Defendants filed the motions to dismiss that are now before the Court.

---

[1] When reviewing a motion to dismiss, the Court takes as true the factual allegations pleaded in the complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

Defendants move for dismissal on several different grounds: some for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1); some for lack of personal jurisdiction, pursuant to Rule 12(b)(2); and all for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6). Many of the Rule 12(b)(6) grounds for dismissal are applicable to all Defendants. The Court will address first those arguments that would dispose of a claim as to all Defendants and will then turn to the individual motions to dismiss.

## III.    LEGAL STANDARDS

### A.    RULE 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to challenge the subject matter jurisdiction of the district court to hear the case. "Under Rule 12(b)(1), a claim is properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (quotation omitted). A finding that the court lacks subject matter jurisdiction may be based upon: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Barrera -Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996). The burden to establish subject matter jurisdiction is on the party asserting jurisdiction. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

### B.    RULE 12(b)(2)

Rule 12(b)(2) of the Federal Rules of Civil Procedure governs dismissal for lack of personal jurisdiction. When a nonresident defendant challenges personal jurisdiction, the plaintiff has the burden of demonstrating facts sufficient to support jurisdiction. *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985). "The court may determine the jurisdictional issue by receiving

3

affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Id.* The court "must resolve all undisputed facts submitted by the plaintiff, as well as all facts contested in the affidavits, in favor of jurisdiction." *Luv N' care, Ltd. v. Insta–Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006) (internal citations omitted).

### C.    RULE 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

To withstand a Rule 12(b)(6) motion, a "complaint must allege 'more than labels and conclusions,'" and "'a formulaic recitation of the elements of a cause of action will not do.'" *Norris v. Hearst Trust*, 500 F.3d 454, 464 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). A "complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (footnote omitted) (quoting *Twombly*, 550 U.S. at 555).

4

IV.     **ANALYSIS**

    A.     GROUNDS FOR DISMISSAL THAT PERTAIN TO ALL DEFENDANTS

        1.     **Claim for Breach of Implied Warranty**

Plaintiffs allege that various Defendants breached "the implied warranty of merchantability with regard to the sale, service, and maintenance of the products they sold to the plant," including "plant operation systems" and "monitoring or metering equipment." Fourth Am. Compl. ¶ 154. To recover on a breach of warranty claim in Texas, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." TEX. BUS. & COM. CODE § 2.607(c)(1). The "'[f]ailure to notify the seller of the breach, thereby allowing the seller an opportunity to cure, bars recovery on the basis of breach of warranty.'" *McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 705 (5th Cir. 2014) (quoting *Lochinvar Corp. v. Meyers*, 930 S.W.2d 182, 189 (Tex.App.-Dallas 1996, no writ)). Defendants argue that the breach of warranty claim must be dismissed because Plaintiffs failed to give them the required pre-suit notice. Plaintiffs concede that they failed to provide notice of the alleged breach. Pls.' Resp. Mot. Dismiss 17 (Doc. No. 145); Pls.' Resp. Mot. Dismiss 8 (Doc. No. 148). They contend, however, that the notice requirement applies only to the *buyer* of the defective product and that, as "non-purchasing bystanders," Plaintiffs had no obligation to provide pre-suit notice. *Id.*

Plaintiffs' interpretation of the notice requirement is not correct. Plaintiffs rely exclusively on a 1979 Texas Court of Appeals decision, *Vintage Homes, Inc. v. Coldiron*, for the proposition that the notice requirement of § 2.607 does not apply to a non-buyer. In *Vintage Homes*, the court interpreted § 2.607 to "appl[y] only as between a buyer and his immediate seller." 585 S.W.2d 886, 888 (Tex. Civ. App. 1979). However, *Vintage Homes* is no longer good law. As the Fifth Circuit has observed:

> We note that [*Vintage Homes*] was based on a commentary which discussed a version of section 2.607 that differed in an important respect from the version enacted into Texas law as Tex. Bus. & Com.Code § 2.607(c)(1). The version discussed by that commentary required that the buyer give note to "his" seller, while the Texas version of section 2.607(c)(1) requires that notice be given to "the" seller.

*McKay*, 751 F.3d at 707 (quoting *Wilcox v. Hillcrest Memorial Park of Dall.*, 696 S.W.2d 423, 424–25 (Tex.App.-Dallas 1985, writ ref'd n.r.e)). Both Texas and federal court authority support the view that "beneficiaries of a product who are not the buyers still have a duty to notify the seller of problems with the product." *Timoschuk v. Daimler Trucks N. Am.*, LLC, No. SA-12-CV-816-XR, 2014 WL 2592254, at *5 (W.D. Tex. June 10, 2014); *Alvarado v. Conmed Corp.*, No. CIVAEP06CV0198-KC, 2008 WL 2783510, at *9 (W.D. Tex. Mar. 13, 2008) ("[B]ecause Texas courts have found that third-parties may recover for injuries under the UCC, the relevant terms of the UCC with regard to notice must . . . therefore apply to Plaintiff."); *Ibarra v. Nat'l Constr. Rentals, Inc.*, 199 S.W.3d 32, 37-38 (Tex. App. 2006);  *U.S. Tire-Tech, Inc. v. Boeran, B.V.*, 110 S.W.3d 194, 199-200 (Tex. App. 2003). Indeed, the UCC itself provides, in the Comments to § 2.607, that "the reason of this section does extend to requiring the beneficiary to notify the seller that an injury has occurred . . . . even a beneficiary can be properly held to the use of good faith in notifying." TEX. BUS. & COM. CODE § 2.607(c)(1), cmt. 5. If the right, under the Texas Uniform Commercial Code, to recover for breach of warranty extends to non-buyer beneficiaries—and undoubtedly it does—then so too must the Code's prerequisites for recovery. *Garcia v. Texas Instruments, Inc.*, 610 S.W.2d 456, 465 (Tex. 1980). Because Plaintiffs failed to comply with the statutory notice requirement, their claim for breach of implied warranty must be dismissed.

### 2.      § 1985(2) Claim

42 U.S.C. § 1985(2) prohibits "conspiracies directed at the right of participation in federal judicial proceedings." *Montoya v. FedEx Ground Package Sys., Inc.*, 614 F.3d 145, 149 (5th Cir. 2010). Plaintiffs bring a claim under § 1985(2) alleging that various Defendants engaged in "a conspiracy to threaten Plaintiffs with bodily harm and property damage if they proceeded with their claims in this Federal Court." Fourth Am. Compl. ¶ 81; *see also id.* ¶ 134.

This claim does not pass muster under the pleading standards of Rules 8(a)(2) and 12(b)(6). The Complaint pleads no facts, as to any defendant, to support the § 1985(2) claim. Plaintiffs offer nothing more than "'labels and conclusions'" and "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555-57). *See, e.g.*, Fourth Am. Compl. ¶ 82 ("The conspiracy consisted of threats to Plaintiffs if they should proceed in this litigation and threats to their financial and economic livelihood should they not dismiss their cases. The threats were made by individuals who were connected with, or in the employment of or under the direction of the PeMex Defendants and the P.M.I. Defendants, and they occurred after the case was removed to this United States District Court, and they were made with the intent to prevent parties and witnesses from accessing, and testifying in this cause of action."). Such vague allegations, without more, fail to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Therefore, Plaintiffs' § 1985(2) claim must be dismissed.

### 3.      Loss of Consortium

The Complaint identifies three Plaintiffs who "are filing claims for loss of consortium, household services, [and] medical services provided to their injured husbands."[2] Fourth Am.

---

[2] The loss of consortium claims are brought by Plaintiffs Evelyn Marisol Luna Santos, Anailem Mora Garcia, and Irma Ferral Casados.

Compl. ¶ 26. The sentence quoted here is the only allegation pertaining to loss of consortium in the Complaint. Defendants argue that this is not sufficient to state a claim for loss of consortium. *See, e.g.*, Mot. Dismiss 6 (Doc. No. 141). Plaintiffs contend that "loss of consortium is not a cause of action in itself" but rather only a "form of damages," and, as such, "the allegation that Plaintiffs sustained loss of consortium is, *ipso facto*, sufficient." Pls.' Resp. Def.'s Mot. Dismiss 6 (Doc. No. 148).

The Court agrees with Defendants. Texas law establishes loss of consortium as an independent cause of action when a spouse, parent, or child suffers actionable non-fatal physical injury. *See In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 646 (Tex. 2009) ("[L]oss of consortium claims are . . . separate and independent claims distinct from the underlying action."); *Whittlesey v. Miller*, 572 S.W.2d 665, 667 (Tex. 1978). Because loss of consortium is an independent claim for relief, Plaintiffs cannot make an end-run around the pleading requirements of Rule 12(b)(6), and, with respect to loss of consortium, Plaintiffs' Complaint does not meet the applicable requirements. Plaintiffs have provided no factual allegations whatsoever to support the claim for loss of consortium. Plaintiffs allege only that their husbands were severely injured; they do not allege that they have been deprived of "companionship, emotional support, love, felicity, and sexual relations," which is required to support a loss of consortium claim.[3] *Whittlesey*, 572 S.W.2d at 667. Therefore, Plaintiffs' claim for loss of consortium must be dismissed.

---

[3] To the extent that Plaintiffs' loss of consortium claim is based on "household services, [and] medical services provided to their injured husbands," Fourth Am. Compl. ¶ 26, such a claim is not cognizable under Texas law. *See Whittlesey*, 572 S.W.2d at 666, 666 n.2 (loss of consortium "does not include the 'services' rendered by a spouse to the marriage," such as "the performance by a spouse of household and domestic duties.").

### 4.        Statute of Limitations

The Court's June 2015 Order held that the claims of three later-added plaintiffs—Marcelino Rios Pecina, Delta Alicia Zamora Galvan, and Leticia Aguilar-Sanchez—were barred by Texas's two-year statute of limitations for personal injuries. *See* Mem. & Order, June 22, 2015, at 13; Tex. Civ. Prac. Rem. Code § 16.003. Despite the Court's ruling, these individuals remain named as Plaintiffs in the Fourth Amended Complaint. *See* Fourth Am. Compl. ¶¶ 21, 24, 25. Defendants therefore seek dismissal of the later-added plaintiffs' claims. The later-added plaintiffs do not dispute the dismissal of their claims, except as to one, the claim for breach of implied warranty, which carries a four-year statute of limitations.[4] Tex. Bus. & Com. Code Ann. § 2.725; Pls.' Resp. Mot. Dismiss 2 (Doc. No. 148). The Court need not reach the issue of whether the breach of warranty claim was timely filed because the Court has already determined that this claim must be dismissed for failure to provide pre-suit notice. *See supra* p. 5-6. Thus, all claims by the later-added plaintiffs are dismissed.

### 5.        Res Ipsa Loquitur

The Complaint pleads res ipsa loquitur as if it were a separate claim for relief. It is not. "Res ipsa loquitur is simply a rule of evidence by which negligence may be inferred by the jury; it is not a separate cause of action from negligence." *Haddock v. Arnspiger*, 793 S.W.2d 948, 950 (Tex. 1990). Plaintiffs' purported claim for res ipsa loquitur is therefore dismissed.

---

[4] In the June 2015 Order, the Court noted that "Plaintiffs suggest they may add a breach of implied warranty claim to a future amended complaint" and that the "Court's decision today does not affect the availability of that claim to the Plaintiffs whose negligence claims are time-barred." Mem. & Order, June 22, 2015, at 13 n.10.

### B.    THE INDIVIDUAL MOTIONS TO DISMISS

#### 1.    Motion to Dismiss by Kinder Morgan

Defendant Kinder Morgan[5] was allegedly "responsible for the transportation of the gas involved in th[e] explosion and fire." Fourth Am. Compl. ¶ 104. The Complaint alleges that Kinder Morgan, through a number of actions and omissions, failed to act as a reasonably prudent pipeline operator would have under the circumstances. *Id.* at ¶ 71. Specifically, Plaintiffs claim that Kinder Morgan failed to equip the pipeline with "adequate compressor stations or dehydration plants to properly remove any water or solids picked up by the gas in transit through the pipeline," *id.* ¶ 70; failed "to ensure adequate NGL [natural gas liquids] absorbent oil was introduced into the natural gas prior to transportation," *id.*; failed "to ensure the proper dehydration prior to and during . . . transportation," *id.*; failed "to inspect the plant to ensure the storage facilities and pipeline welds, piping and process equipment was sufficient to handle the natural gas sold by Kinder Morgan," *id.*; and failed "to warn the PeMex defendants of the lack of Odorant, excessive temperature and improper liquid levels of the gas, and improper storage facilities," *id.* Plaintiffs allege that these acts and omissions were "central to the explosion," *id.* ¶ 76, and "a proximate cause of the plaintiff's [sic] injuries and damages," *id.* ¶ 70. Plaintiffs bring claims for negligence, negligence per se, gross negligence, and breach of quiet enjoyment.

Kinder Morgan contends that all of the claims against it should be dismissed for the same reason: Plaintiffs have failed to specify the "specific statutes, rules, regulations, and/or standards that Plaintiffs allege create the duties . . . . that serve as the basis for Plaintiffs' negligence, negligence per se, gross negligence, and breach of quiet enjoyment claims." Defs.' Mot. Dismiss 3 (Doc. No. 137). Kinder Morgan is correct that the Complaint includes no specific statutory or

---

[5] The entities collectively referred to as "Kinder Morgan" are also referred to in the Complaint as the "pipeline defendants." Fourth Am. Compl. ¶ 69.

regulatory provision that it—or any other Defendant—is alleged to have violated. For this reason, as is discussed below, Plaintiffs' negligence per se claim must be dismissed. However, Plaintiffs' failure to identify a statutory violation is not fatal to their general negligence or gross negligence claims, and so these claims will survive Kinder Morgan's motion to dismiss. The claim for breach of quiet enjoyment must be dismissed on other grounds, as explained below.

a.    *Negligence per se*

Negligence per se applies when the courts have determined that the violation of a particular statute is negligence as a matter of law. *See Parrot v. Garcia*, 436 S.W.2d 897, 900 (Tex. 1969). The Complaint lists a number of administrative agencies and industry associations whose "rules and regulations" Kinder Morgan's conduct allegedly violates. *See* Fourth Am. Compl. ¶ 70 ("The gas sold was therefore . . . in violation of TRRC [the Texas Railroad Commission], ICC [the Interstate Commerce Commission] and Department of Transportation rules and regulations and in violation[] of The Natural Gas Pipeline Safety Act, American Gas Association rules, and Natural Gas Association rules."); *id.* ¶ 131 ("They violated Texas Railroad Commission rules and regulations, Department of Transportation rules and regulations and API protocol for the safe transportation, storage and handling of hazardous materials."). However, such allegations are not sufficient to state a claim for negligence per se. While Plaintiffs have recited the names of various bodies of regulation and one federal statute (the Natural Gas Pipeline Safety Act, 49 U.S.C. § 60102), the Complaint fails to identify any specific statutory provision that Kinder Morgan violated.[6] Without a citation to a statutory provision, the Court is

---

[6] Nor were Plaintiffs able to identify any statutory provisions in their Response to Kinder Morgan's Motion to Dismiss. *Cf. Welch v. Loftus*, 776 F. Supp. 2d 222, 226 (S.D. Miss. 2011) (declining to dismiss negligence per se claim for failure to allege the applicable statutory provision  because plaintiff cited the correct statutory provision in his brief opposing dismissal

unable to determine whether the facts alleged state a violation of any statute. And without an allegation that a statute has been violated, a complaint cannot state a claim for negligence per se.[7] *See In re Oil Spill by the Oil Rig DEEPWATER HORIZON*, 835 F. Supp. 2d 175, 182 (E.D. La. 2011), *aff'd sub nom. In re DEEPWATER HORIZON*, 745 F.3d 157 (5th Cir. 2014) ("[T]he complaints fail to plead any specific statutes on which the negligence per se claims are based; therefore, those claims are dismissed."); *Allison v. J.P. Morgan Chase Bank, N.A.*, No. 1:11-CV-342, 2012 WL 4633177, at *14 (E.D. Tex. Oct. 2, 2012) ("[T]he pleading does not factually allege the violation of a specific statute, much less state how courts have determined that statute to establish negligence per se. Therefore, the factual allegations are insufficient to survive a motion to dismiss.").

The negligence per se pleadings also suffer from an even more basic deficiency. Under Texas law, only the violation of "a penal statute" can give rise to negligence per se. *Smith v. Merritt*, 940 S.W.2d 602, 607 (Tex. 1997); *see also Perry v. S.N.*, 973 S.W.2d 301, 304-07 (Tex. 1998); *Ridgecrest Retirement & Healthcare v. Urban*, 135 S.W.3d 757, 762 (Tex.App.-Hous. [1st Dist.] 2004, pet. denied) ("A violation of a non-penal administrative code statute does not establish a negligence per se claim."). A "penal statute is one that defines a criminal offense and specifies a corresponding fine, penalty or punishment." *Pack v. Crossroads, Inc.*, 53 S.W.3d 492, 509–10 (Tex.App.-Ft. Worth 2001, pet. denied). Of the various administrative rules, regulations, industry standards, and the one federal civil statute that are listed in the Complaint, "none . . . are

and because "the Complaint alleges particular conduct that clearly violates a statute," "notwithstanding the absence of an explicit citation to authority").

[7] Even if there was a clear allegation of a statutory violation, it is not as though "any statutory violation is automatically negligence per se." *Perry v. S.N.*, 973 S.W.2d 301, 304 n.4 (Tex. 1998). Rather, it is for the courts to *decide* whether a particular statutory provision "is an appropriate basis for tort liability." *Id.* at 305. When given only a generic list of regulatory and statutory authorities, as Plaintiffs have listed in their Complaint, it is not possible for the Court to make this determination.

penal in nature, and therefore none can serve as the basis of a negligence per se claim." *Watkins v. Cornell Companies, Inc.*, No. 3:11-CV-260-M-BN, 2013 WL 1914713, at *3 (N.D. Tex. Mar. 15, 2013), *report and recommendation adopted*, No. 3:11-CV-260-M-BN, 2013 WL 1926375 (N.D. Tex. May 8, 2013); *see also Mann v. Geriatric Services, Inc.*, No. 4–4–649–cv, 2005 WL 3445987, at *6 (Tex. App.-San Antonio 2006, no pet.); *Ridgecrest*, 135 S.W.3d at 762–63.

### b.    Negligence and Gross Negligence

Under Texas law, the elements of a negligence claim are: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) damages proximately caused by the breach. *Federal Deposit Insurance Corp. v. Ernst & Young*, 967 F.2d 166, 170 (5th Cir. 1992); *Werner v. Colwell*, 909 S.W.2d 866, 869 (Tex. 1995). Kinder Morgan contests the sufficiency of the pleadings only with respect to the first element—the existence of a duty. Kinder Morgan relies on the same argument discussed above, *i.e.*, that Plaintiffs have failed to specify the statutory source of the duty that Kinder Morgan allegedly owed to Plaintiffs. While this omission from the pleadings is fatal to the negligence per se claim, it does not require that Plaintiffs' claims for negligence and gross negligence also be dismissed.[8]

---

[8] Gross negligence, a heightened form of negligence, requires two elements in addition to the threshold element of duty: "(1) when viewed objectively from the defendant's standpoint at the time of the event, the act or omission involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others and (2) the defendant had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others." *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012). Because the duty element—the only element here in dispute—is the same for gross negligence and general (or "simple") negligence, the Court will address the sufficiency of these claims together. *See City of Waco v. Kirwan*, 298 S.W.3d 618, 623 (Tex. 2009) ("As with negligence actions . . . a defendant may be liable for gross negligence only to the extent that it owed the plaintiff a legal duty.").

Unlike in claims for negligence per se, the concept of duty in common law negligence actions does not depend on any obligation created by statute.[9] The "defendant in most negligence per se cases already owes the plaintiff a *pre-existing* common law duty to act as a reasonably prudent person[.]" *Perry*, 973 S.W.2d at 306 (emphasis added). It is well established that pipeline operators, such as Kinder Morgan, have a duty to ensure that their equipment and processes are "reasonably safe for the transportation of [natural gas],"and that they will "stand[] accountable for any foreseeable injury resulting from [their] failure in this regard." *Saucedo v. Phillips Petroleum Co.*, 670 F.2d 634, 636 (5th Cir. 1982); *see also Lane v. Cmty. Nat. Gas Co.*, 123 S.W.2d 639, 642 (Tex. 1939). It is also well established that the standard of care that applies in such cases is that of "a prudent natural gas handler or purveyor under the circumstances, in light of the hazardous nature of natural gas." *Ayers v. ANR Pipeline Co.*, No. CIV.A. 10-925, 2011 WL 2935394, at *1 (W.D. La. July 15, 2011); *see also Lane*, 123 S.W.2d at 643 ("A gas company, since it is dealing with a highly dangerous substance, is bound to use a degree of care commensurate with the danger of its gas escaping and causing injury or damage to the person or property of others."); *Entex, A Div. of Noram Energy Corp. v. Gonzalez*, 94 S.W.3d 1, 6 (Tex. App. 2002) ("A gas company may be liable if facts show that it fails to act reasonably after having notice of defects in the pipes through which gas flows.").

This is precisely the standard of care that the Complaint alleges Kinder Morgan breached. The Complaint states that Kinder Morgan "fail[ed] to exercise the same degree of care as a reasonable pipeline company." Fourth Am. Compl. ¶ 71; *see also id.* ¶ 103 ("The failure of the pipeline defendants to ensure that the proper amount and type of liquids were present in the gas increased the explosion potential and made the gas unreasonably dangerous."). In addition, the

---

[9] In fact, even in negligence per se claims, it is generally not the duty, but rather only the standard of care, that is imported from statute. *See Perry*, 973 S.W.2d at 306-07.

Complaint specifically identifies the foreseeability of the harm caused by Kinder Morgan's alleged failings. *See, e.g.*, *id.* ¶ 71 ("The Kinder Morgan and pipeline defendant's failure to inspect, maintain or properly transport the natural gas, their failure to ensure the gas was properly dried and contained odorant are all known causes of pipeline explosions, failures and have resulted in many deaths. As a result the pipeline defendants had previous knowledge of the need to perform these basic pipeline safety steps and to safely transport the natural gas."). Thus, this is not a case where the pleadings allege actions by a pipeline operator that have an "unprecedented" or "unknown" causal connection to the "volatility" of the substance that caused the explosion. *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 68 (5th Cir. 1987). The allegations in the Complaint are sufficient to state a claim against Kinder Morgan for both negligence and gross negligence.

### c. Breach of Quiet Enjoyment

Plaintiffs also bring against Kinder Morgan a claim for breach of "Plaintiffs' Right to Quiet Enjoyment." Under Texas law, "[t]he elements of a breach of the warranty of quiet enjoyment are the same as the elements in a constructive eviction claim." *Daftary v. Prestonwood Mkt. Square, Ltd.*, 404 S.W.3d 807, 816 (Tex. App. 2013). A breach of the covenant of quiet enjoyment requires "an eviction, actual or constructive, brought about by the acts of the landlord, those acting for the landlord, or those acting with the landlord's permission." *Nalle Plastics Family Ltd. Partnership v. Porter, Rogers, Dahlman & Gordon, P.C.*, 406 S.W.3d 186, 204 (Tex. App. 2013). In a claim for breach of quiet enjoyment, the plaintiff and the defendant must have been in a landlord-tenant relationship at the time that "the landlord act[ed] in a way to interfere with the tenant's enjoyment of the premises." *Daftary*, 404 S.W.3d at 816. There is nothing in the pleadings to suggest that Kinder Morgan and Plaintiffs were ever in a

landlord-tenant relationship. Therefore, Plaintiffs claim against Kinder Morgan for breach of quiet enjoyment is dismissed.

### 2. Motion to Dismiss by the Pemex Defendants

The Pemex Defendants claim that they are immune from federal jurisdiction under the Foreign Sovereign Immunities Act ("the FSIA" or "the Act"), 28 U.S.C. §§ 1602–1611, and that Plaintiffs' claims must therefore be dismissed for lack of subject matter jurisdiction.[10] "Under the FSIA, 'a foreign state is presumptively immune from [the] jurisdiction of the United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state.'" *UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 581 F.3d 210, 215 (5th Cir. 2009) (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993)). The party asserting FSIA immunity has the initial burden of establishing a prima facie case that it constitutes a "foreign state" within the meaning of the FSIA. *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 847 (5th Cir. 2000). Once this prima facie case is established, "the burden shifts to the party opposing immunity to present evidence that one of the exceptions to immunity applies." *Id.* Nevertheless, the "party claiming FSIA immunity retains the ultimate burden of persuasion on immunity." *Id.*

In deciding a claim of foreign sovereign immunity, the threshold issue is whether the party asserting immunity satisfies the Act's definition of a "foreign state." The term "foreign state" is defined by the Act as including an "instrumentality of a foreign state." 28 U.S.C. § 1603(a). An entity can fulfill the requirements for "instrumentality" status in two different ways: (1) if the "majority of [the entity's] shares or other ownership interest is owned by a foreign

---

[10]   The FSIA provides the sole source of subject matter jurisdiction over a foreign state. *Dale v. Colagiovanni*, 443 F.3d 425, 427–28 (5th Cir. 2006) (citing *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434–39 (1989)).

state," *id*. § 1603(b)(2), *or* (2) if the entity is "an organ of a foreign state or political subdivision thereof," *id*.[11] *See generally Kelly*, 213 F.3d at 846 (discussing whether Syrian corporation met requirements for both prongs of § 1603(b)(2)).

The parties agree that, for purposes of the "foreign state" determination, the analysis applicable to Defendant Pemex is distinct from that which applies to the remaining Pemex Defendants (PEP, PXR, PGPB, and PPQ, collectively "the Pemex Subsidiaries"). Pemex's status as a "foreign state" is undisputed. Because Pemex is wholly owned by the Mexican government, it qualifies as an "instrumentality of a foreign state" under the majority-ownership prong of § 1603(b)(2). *See* Pls.' Resp. Mot. Dismiss 2 n.1 (Doc. No. 171) ("Plaintiffs acknowledge that Defendant Pemex is a foreign instrumentality under the FSIA, because it is wholly owned by the Mexican government."); *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 533 (5th Cir. 1992) ("That Pemex is a foreign government instrumentality is undisputed."). However, unlike Pemex, the Pemex Subsidiaries cannot claim "instrumentality" status under the majority-ownership prong. This is because only direct ownership by the state will satisfy the majority-ownership provision of § 1603(b)(2). *Dole Food Co. v. Patrickson*, 538 U.S. 468, 477 (2003) ("A corporation is an instrumentality of a foreign state under the FSIA only if the foreign state itself owns a majority of the corporation's shares."). Because the Pemex Subsidiaries are owned by Pemex, they are owned by an "instrumentality of a foreign state," rather than by the foreign state itself.

---

[11] In addition to being either majority-owned by a foreign state or "an organ" of a foreign state, the entity must also (1) be "a separate legal person, corporate or otherwise," 28 U.S.C. § 1603(b)(1), and (2) be "neither a citizen of a State of the United States . . ., nor created under the laws of any third country," *id.* § 1603(b)(3). Plaintiffs do not dispute that the Pemex Defendants satisfy these requirements.

While they cannot seek "instrumentality" status under the majority-ownership prong of §

1603(b)(2), the Pemex Subsidiaries argue that they are entitled to such status under the "organ of

a foreign state" prong. The question, therefore, is whether the Pemex Subsidiaries qualify as

"organ[s] of a foreign state" within the meaning of the FSIA. The Fifth Circuit has developed a

five-factor framework to assist in determining "organ" status under § 1603(b)(2):

> (1) whether the foreign state created the entity for a national purpose; (2) whether
> the foreign state actively supervises the entity; (3) whether the foreign state
> requires the hiring of public employees and pays their salaries; (4) whether the
> entity holds exclusive rights to some right in the [foreign] country; and (5) how
> the entity is treated under foreign state law.

*Kelly*, 213 F.3d at 846-47 (alteration in original) (quoting *Supra Med. Corp. v. McGonigle*, 955

F. Supp. 374, 379 (E.D. Pa. 1997)). When applying these factors, the Court must look to the

status of the entity "at the time suit is filed." *Dole Food Co.*, 538 U.S. at 478.

The issue of whether the Pemex Subsidiaries may be considered an "organ" of the

Mexican Government presents a difficult question because at the time this lawsuit was filed—

September 17, 2014—the structure of the Mexican oil and gas industry was undergoing

significant change. It is undisputed that Mexico has, over the last few years, enacted "[e]nergy

reform" that has "revolutionized the oil and gas industry in Mexico." Pls.' Resp. Defs.' Mot.

Dismiss 8 (Doc. No. 171); *see also* Defs.' Reply Supp. Mot. Dismiss Ex. 1, Decl. Julián Mora

Salas ¶ 10 [hereinafter Salas Decl.] (Doc. No. 174-1) ("[L]aws were enacted, reformed, or

repealed that govern operations of the energy industry in Mexico and the participation of private

enterprise and of the Regulating bodies in energy matters."). Plaintiffs do not contest the fact

that, prior to these reforms, the Pemex Subsidiaries were "organs" of the Mexican government.

*See* Pls.' Resp. Defs.' Mot. Dismiss 8-9 (Doc. No. 171). However, "[a]s a result of the energy

reform legislation—passed over a month before Plaintiffs' suit was filed—the Pemex

Subsidiaries," Plaintiffs argue, "are no longer decentralized public organs of the Mexican state," but rather are "similar to a private company." *Id.* at 8 (internal quotation and alteration omitted). The question of the Pemex Subsidiaries' "organ" status is no doubt much closer than it would have been had this case been filed prior to the Mexican energy sector reforms. Nevertheless, the Court finds that the evidence the Pemex Subsidiaries have presented is sufficient to carry their prima facie burden of proving "organ" status.

Because it was the legislative reforms that, according to Plaintiffs, caused the Pemex Subsidiaries to "no longer have the characteristic[s] of organs," *id.* at 9, it is critical to consider the timing of the implementation of these reforms vis-à-vis the timing of this lawsuit (September 17, 2014).[12] It is undisputed that the reforms were initiated by the passage of several amendments to the Mexican Constitution on December 20, 2013. *Id.* Ex. A, Affidavit of José Luis Herrera Vaca ¶ 2 [hereinafter Vaca Aff.] (Doc. No. 171-1); Salas Decl. ¶¶ 7-8. The constitutional amendments were then followed by various pieces of legislation, passed on August 11, 2014. Significantly, however, the reforms adopted in these constitutional and legislative enactments did not go into effect with respect to the Pemex Subsidiaries until 2015—well after this litigation was filed. Defendant PEP, the exploration and production subsidiary of Pemex, was converted from a decentralized public agency to a state-owned productive enterprise effective May 29, 2015. *Id.* ¶ 16. Five months later, the other Pemex Subsidiaries (PXR, PGPB,

---

[12] Plaintiffs argue that the Court should focus on the date of the formal change in Mexican law as opposed to the date on which those changes were implemented. The Court disagrees. Only one of the five *Kelly* factors pertains to the entity's formal legal designation, *see Kelly*, 213 F.3d at 847 ("[H]ow the entity is treated under foreign state law."). The other four factors all direct the Court's inquiry toward the practical realities of the entity's relation to the foreign sovereign. *Id. See also, e.g., Bd. of Regents of Univ. of Texas Sys. v. Nippon Tel. & Tel. Corp.*, 478 F.3d 274, 280 (5th Cir. 2007) (refusing to credit characteristics of the entity which were formally true but which, in reality, amounted to "a historical artifact of [the entity's] origins").

and PPQ) were also converted to a state-owned productive enterprise when they were dissolved and replaced by a new entity known as PTRI on November 1, 2015. *Id.* ¶ 18. Plaintiffs do not contest this timeline. In sum, then, whatever changes to the structure of the Pemex Subsidiaries were occasioned by the reform legislation, it is undisputed that those changes were not implemented in the Pemex Subsidiaries until many months after this suit was filed.

But even if the legislative changes *had* been fully implemented prior to this litigation, the *Kelly* factors would still weigh in favor of classifying the Pemex Subsidiaries as an "organ" of the Mexican government. The signal achievement of the reform legislation was to permit private companies to compete with Pemex and its subsidiaries in the market for the "exploration and extraction" of "hydrocarbons and petrochemicals" in Mexico. *Id.* ¶¶ 9-10; *see also* Vaca Aff. ¶ 6. Thus, Pemex and its subsidiaries no longer satisfy the criterion of "whether the entity holds exclusive rights to some right in the [foreign] country." *Kelly*, 213 F.3d at 846. But aside from this one factor, the rest of the *Kelly* framework points decisively toward "organ" status.[13] First, the Creation Decrees of PEP and PTRI make clear that the Pemex Subsidiaries retain a distinctly national purpose. *See* Salas Decl. ¶ 17 (quoting Article One of PEP's Creation Decree: "Pemex Exploración y Producción's objective is to generate economic value and profitability for the Mexican government."); *Id.* ¶ 19 (same for PTRI). Second, the Mexican government maintains various forms of control and supervision over the Pemex Subsidiaries. *See id.* ¶ 28 ("The Petróleos Mexicanos Act establishes that the budget of [the Pemex Subsidiaries] is introduced by the Mexican government, through the Department of The Treasury and Public Credit, to the Congress of the Unión for its authorization through the Budget of Expenditures of the Federation, which encompasses the public spending of the Mexican government."); *id.* ¶ 35

---

[13] The *Kelly* court explained that "we will *not* apply [the factors] mechanically or require that all five support an organ-determination." *Kelly*, 213 F.3d at 847.

("Contracting by [the Pemex Subsidiaries] is subject to the approval, control, and supervision of various public bodies, established by the Mexican Congress."). Third, the employees of the Pemex Subsidiaries are "public servants," *id.* ¶ 23, whose salaries are paid by the Mexican government, *id.* ¶ 32. And, fourth, the Pemex Subsidiaries are entirely owned by the Mexican Government, *id.* ¶ 2, and "are subject to a special public-law legal regime," *id.* ¶ 6. This evidence is more than sufficient to conclude that the Pemex Subsidiaries have made a prima facie showing that they are an "instrumentality of a foreign state" under the "organ" prong of § 1603(b)(2).

Because the Pemex Defendants have established a prima facie case that they are a "foreign state," the burden shifts to Plaintiffs "to present evidence that one of the exceptions to immunity applies." *Kelly*, 213 F.3d at 847. Plaintiffs assert the "commercial activity" exception provided under § 1605(a)(2). Section 1605(a)(2) states, in relevant part, that a foreign sovereign shall not be immune "in any case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605. "In order to satisfy the commercial activities exception to sovereign immunity, the commercial activity that provides the jurisdictional nexus with the United States must also be the activity on which the lawsuit is based." *Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo Gen. del Sindicato Revolucionario de Trabajadores Petroleros de la República Mexicana, S.C.*, 923 F.2d 380, 386 (5th Cir. 1991).

Plaintiffs base their claim of the applicability of the commercial activity exception on the following theory: "Defendants caused non-odorized gas to be purchased from Texas, and this gas, in turn, caused the explosion at Defendants' factory." Pls.' Resp. Mot. Dismiss 11 (Doc. No. 171). However, Plaintiffs have presented no evidence in support of this theory—they rely solely on the bare jurisdictional allegations pleaded in their Complaint. *See* Pls.' Resp. Mot. Dismiss

10-12 (Doc. No. 171). This will not suffice. Because the burden on the party opposing immunity is, at this stage, one of production, Plaintiffs must present at least *some* evidence in support of the exception to immunity. *See Evans v. Petroleos Mexicanos (PEMEX)*, No. 05-20434, 2006 WL 952265, at *2 (5th Cir. Apr. 13, 2006) ("Generalized and conclusory allegations that the § 1605(a)(2) exceptions apply are not sufficient to establish a jurisdictional nexus."); *Byrd v. Corporacion Forestal y Indus. de Olancho S.A.*, 182 F.3d 380, 388 (5th Cir. 1999) *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305, 130 S. Ct. 2278, 176 L. Ed. 2d 1047 (2010); *Arriba*, 962 F.2d at 533 ("[T]he plaintiff must produce some facts to show that the commercial activity exception to immunity applies[.]"). Here, the only evidence on the applicability of the commercial activity exception is the undisputed evidence provided by the Pemex Defendants that "none of the gas" at the refinery "originated from the United States." Defs.' Mot. Dismiss Ex. 2, Decl. Juan Carlos González Magallanes, ¶ 11 (Doc. No. 160-2).

Aside from their failure of proof, Plaintiffs have failed even to plead facts that, if true, would establish the commercial activities exception.[14] There is only one allegation in the Complaint that supports Plaintiffs' commercial activities theory. *See* Pls.' Fourth Am. Compl. ¶ 76 ("The gas that was the 'cause' of the explosion was purchased in the State of Texas and transported through the State of Texas."). This allegation is insufficient in two critical respects: first, it fails to provide any factual elaboration for the conclusory assertion that the gas purchased in Texas *caused* the explosion, and, second, it fails to allege that it was the *Pemex Defendants* who purchased the gas.

---

[14] For this reason, the Court must deny Plaintiffs' request to conduct discovery on the issue of the Pemex Defendants' commercial activities in Texas. *See Evans*, 2006 WL 952265, at *2 ("As the facts alleged by [plaintiff] are insufficient to support a § 1605(a)(2) exception to FSIA, [plaintiff] is not entitled to burden [defendants] with the lengthy and costly process of discovery to build his case.").

Because the Pemex Defendants are foreign sovereigns under the FSIA, and because Plaintiffs have failed to establish that an exception to foreign sovereign immunity applies, the FSIA requires the Court to grant the Pemex Defendants' Motion to Dismiss. Accordingly, all claims against them must be dismissed.

### 3.     Motion to Dismiss by PMI Comercio, PMI Holdings, and PPI

Defendants PMI Comercio, PMI Holdings, and PPI are each subsidiaries of Pemex. They seek dismissal on several grounds. PMI Comercio argues, first, that it is entitled to foreign sovereign immunity and, second, that the Court lacks personal jurisdiction. PMI Holdings and PPI move to dismiss for failure to state a claim.[15]

#### a.     *Defendant PMI Comercio*

##### i.     Foreign Sovereign Immunity

PMI Comercio argues that, like Pemex, it too is immune from federal jurisdiction under the FSIA. Plaintiffs contend that PMI Comercio is not entitled to foreign sovereign immunity because it does not constitute a "foreign state" within the meaning of the FSIA. The Court agrees with Plaintiffs.

PMI Comercio claims that it is an "instrumentality of a foreign state" under the majority-ownership prong of § 1603(b)(2), as a majority of its shares are owned by Pemex. Defs.' Mot. Dismiss 11 (Doc. No. 78). This argument fails. As discussed *supra* p. 17, majority ownership by a foreign state may qualify a corporation for "instrumentality" status only if the entity with the majority interest is itself "a foreign state or political subdivision thereof." *Dole Food Co.*, 538 U.S. at 474-78. Here, as has been explained, it is undisputed that Pemex is not itself "a foreign state or political subdivision thereof"; rather, because Pemex is wholly owned by the Mexican

---

[15] PMI Comercio also moves for dismissal on this ground, but the Court does not reach this argument because it finds that it cannot exercise personal jurisdiction over PMI Comercio.

government, it is an "instrumentality of a foreign state." *See supra* p. 17. Because PMI Comercio is owned by an "instrumentality of a foreign state," PMI Comercio cannot also be an "instrumentality" under the majority-ownership prong. *Dole Food Co.*, 538 U.S. at 478; *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 199 (3d Cir. 2003) ("[A] subsidiary of an instrumentality is not itself an instrumentality."). Nor does PMI Comercio seek "instrumentality" status under the "organ" prong. Because PMI Comercio is not an "instrumentality of a foreign state," and because there is no other basis on which PMI Comercio seeks "foreign state" status, the Court finds that PMI Comercio is not entitled to immunity under the FSIA.

## ii.    Personal Jurisdiction

Because the Court finds that PMI Comercio is not entitled to foreign sovereign immunity, the Court now turns to PMI Comercio's argument that its contacts with the state of Texas are insufficient to establish personal jurisdiction.

The Due Process Clause of the Fourteenth Amendment permits a court to exercise personal jurisdiction over a nonresident defendant[16] when: "(1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state, and (2) the exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice." *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000) (citations and internal quotation marks omitted); *see also International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The "minimum contacts" requirement can be met through contacts sufficient to confer either specific or general personal jurisdiction. *Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001). To establish specific personal jurisdiction, the plaintiff must show that the "defendant . . . purposely directed its

---

[16] It is undisputed that PMI Comercio is incorporated under Mexican law and has its headquarters in Mexico City. Defs.' Mot. Dismiss Ex. 1 ¶ 3 (Doc. No. 78-1).

activities toward the forum state or purposely availed itself of the privileges of conducting activities there."[17] *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002). General personal jurisdiction requires a far greater degree of contact with the forum state. The defendant's "affiliations with the State [must be] so continuous and systematic as to render [it] essentially at home in the forum State.'" *Daimler AG v. Bauman*, 134 S.Ct. 746, 761 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2851 (2011)).

When, as here, the Court decides a motion to dismiss for lack of personal jurisdiction without conducting an evidentiary hearing, the plaintiff is required to present facts sufficient to make out only a prima facie case that jurisdiction exists. *Johnston v. Multidata Systems Intern. Corp.*, 523 F.3d 602, 609 (5th Cir. 2008). The Court "must accept as true [the plaintiff's] uncontroverted allegations, and resolve in [the plaintiff's] favor all conflicts between the facts contained in the parties' affidavits and other documentation." *Alpine View*, 205 F.3d at 215. However, the Court is not required "to credit conclusory allegations, even if uncontroverted." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868 (5th Cir. 2001).

Plaintiffs contend that PMI Comercio has the following in-state contacts:

P.M.I. Comercio maintains extensive transportation and storage capacity in Texas, including at least three storage facilities (in El Paso, Houston, and Brownsville), pipelines to six different refineries, and a natural gas liquids system in Edinburg. Several of P.M.I. Comercio's Texas pipelines—one, for example, running through Brownsville, another running through Corpus Christi—specifically connect to the Reynosa, Mexico refinery where the explosion at issue in this lawsuit occurred.

---

[17] The "minimum contacts" requirement is only the first element of the three-prong test for specific personal jurisdiction. A plaintiff must also show that the "cause of action arises out of or results from the defendant's forum-related contacts" and that "the exercise of personal jurisdiction is fair and reasonable." *Nuovo Pignone, SpA*, 310 F.3d at 378. However, because the Court finds that no minimum contacts exist, it need not consider the second and third prongs. *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 314-15 (5th Cir. 2007).

Pls.' Resp. 3 (Doc. No. 89). The undisputed evidence shows, however, that these purported contacts of PMI Comercio in fact belong to *other* corporate entities within the conglomerate known as the "PMI Group." None can be attributed to PMI Comercio itself. The evidence Plaintiffs cite in support of PMI Comercio's alleged contacts consists of various pages from PMI Comercio's website. *See* Pls.' Resp. 3 n.4-5, 10 n.18-19 (Doc. No. 89). These pages of the website do discuss various holdings located in Texas of the "*PMI Group*" (or "PMI"). *See, e.g.*, Pls.' Resp. Ex. 2, at 2 (Doc. No. 48-4) (showing that "the PMI Group has . . . assets includ[ing] . . . storage terminals and pipelines" in Galena Park, Houston, Brownsville, and Edinburg). However, the website also makes clear that the PMI Group consists of 19 different subsidiary entities, *see* Defs.' Reply 2 (Doc. No. 102-1), and nothing on the website—nor elsewhere in the record—suggests that, of all the PMI Group's subsidiaries, PMI Comercio is the one that owns the Texas holdings. To the contrary, PMI Comercio's unrefuted evidence shows that it owns no property in Texas and has no other commercial contacts with the state. *See* Defs.' Mot. Dismiss Ex. 2, Decl. Leopoldo Simon, ¶ 4 (Doc. No. 78-2) [hereinafter Simon Decl.] ("PMI Comercio does not, nor has it ever, owned hydrocarbon processing facilities or any pipelines. It does not, nor did it ever, own the facility at issue in this lawsuit, or any pipelines connected to it.");[18] *see also id.* ¶ 3 ("[PMI Comercio] does not have an office or any facility in Texas."); *id.* ¶ 6 ("PMI Comercio did not employ any Texas residents at the time of the accident giving rise to this lawsuit."); *id.* Ex. 1, Decl. Victor Briones, ¶ 5 (Doc. No. 78-1) [hereinafter Briones Decl.] ("PMI Comercio has no bank accounts and owns no property in Texas.").[19]

The records of Texas county appraisal districts show that the PMI Group's facilities in Texas are the property of a *different* PMI company, PMI Services North America, Inc. ("PMI

---

[18] Leopoldo Simon is PMI Comercio's Vice President of Crude Oil Logistics.

[19] Victor Briones is PMI Comercio's Vice Present of Crude Oil Trading.

Services"), which has not been named a defendant in this case. *See, e.g.*, Defs.' Reply Ex. 2 (Doc. No. 102-2) (Cameron County Appraisal District Records showing that PMI Services is the owner of the Brownsville facility); *id.* Ex. 3 (Doc. No. 102-3) (El Paso County Appraisal District Records showing the same for the El Paso facility). Plaintiffs do not contest the accuracy or reliability of these records.

Of course, the Fifth Circuit has long recognized that the in-state contacts of one corporation can be imputed to another if the latter is the alter ego of the former. *See Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002) ("[F]ederal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court."); *Stuart*, 772 F.2d at 1197-98. But Plaintiffs have failed to establish that PMI Comercio was the alter ego of PMI Services.[20] The Complaint never alleges—nor have Plaintiffs offered any evidence to prove—that PMI Comercio is the alter ego of PMI Services. Instead, the Complaint makes the collective, conclusory allegation that all PMI Group subsidiaries are alter egos of each other. *See, e.g.*,

---

[20] To impute jurisdictional contacts from one company to another on the basis of an alter ego relationship, the party alleging the existence of personal jurisdiction must demonstrate that "the parent so dominates the subsidiary that 'they do not in reality constitute separate and distinct corporate entities.'" *Dalton v. R & W Marine, Inc.*, 897 F.2d 1359, 1363 (5th Cir. 1990) (quoting *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983)). There are several factors to be used in evaluating whether this test is satisfied, including whether:

> (1) distinct and adequately capitalized financial units are incorporated and maintained; (2) daily operations of the two corporations are separate; (3) formal barriers between management of the two entities are erected, with each functioning in its own best interests; and (4) those with whom the corporations come in contact are apprised of their separate identity.

*Hargrave*, 710 F.2d at 1162–63 (quoting *Miles v. Am. Tel. & Tel. Co.*, 703 F.2d 193, 195 (5th Cir. 1983)).

Fourth Am. Compl. ¶ 32 ("The operations of PeMex, PeMex Exploration and Production[,] and the PMI companies are so intertwined so as to be essentially one company."); *id.* ¶¶ 34, 44. Plaintiffs also assert, only in conclusory terms, that PMI Comercio "operates as an alter ego of" Defendant PMI Holdings, *id.* at ¶ 31, and that PMI Holdings, in turn, "acts as an alter ego" of PMI Services, *id.* ¶ 29.[21] Even assuming that such a "one step removed" alter ego theory of attributing jurisdictional contacts were valid, *see Villar v. Crowley Mar. Corp.*, 780 F. Supp. 1467, 1475 (S.D. Tex. 1992), *aff'd*, 990 F.2d 1489 (5th Cir. 1993) (rejecting such a "one step removed" theory), Plaintiffs' pleadings are not sufficient to establish alter ego, whether between PMI Comercio and PMI Services or any of the other PMI Group entities, because Plaintiffs provide nothing more than bald assertions and conclusory allegations of an alter ego relationship.[22] *See Panda Brandywine*, 253 F.3d at 868; *Dykes v. Maverick Motion Picture Grp., LLC*, No. CIV.A. 08-536-JJB-CN, 2011 WL 900276, at *7 (M.D. La. Mar. 14, 2011) ("merely recit[ing] the factors which courts consider in determining whether to pierce the corporate veil without providing even a modicum of specific facts" is insufficient to establish alter ego for purposes of personal jurisdiction); *S. Bleacher Co. v. Husco, Inc.*, No. 7:01-CV-009-R, 2001 WL 497772, at *6 (N.D. Tex. May 7, 2001) (refusing to find personal jurisdiction on the basis of alter ego where plaintiff presented only "bald assertions and conclusory allegations," and "[n]o

---

[21] PMI Holdings does not contest personal jurisdiction.

[22] Plaintiffs provide only one non-conclusory allegation pertaining to the purported alter ego relationship between PMI Comercio and PMI Holdings: that two companies allegedly currently share an executive-level employee and shared another from 1993 to 1995. Fourth Am. Compl. ¶ 33. This is plainly inadequate to establish alter ego. *Hargrave*, 710 F.2d at 1162 ("Proof of an identity of . . . corporate directors and officers . . . will not justify treatment of the two as one business unit."); *Alpine View*, 205 F.3d at 219 ("[C]ommonality of officers and directors [is] not alone sufficient to establish an alter ego relationship between two corporations." (quoting *Hargrave*, 710 F.2d at 1160)).

evidence whatsoever . . . to demonstrate how any of the [alter ego] factors might be met in this case").

Absent an alter ego relationship, the in-state contacts of other PMI Group subsidiaries, including PMI Services, cannot be imputed to PMI Comercio. Because Plaintiffs have failed to present a prima facie case that PMI Comercio has any contacts with Texas, the Court does not have personal jurisdiction, either general or specific, over PMI Comercio. Accordingly, the claims against PMI Comercio are dismissed.[23]

### b.   Defendants PMI Holdings and PPI

PMI Holdings and PPI contend that the claims against them should be dismissed, under Rules 8(a)(2) and 12(b)(6), for failure to state a claim. The Court will proceed claim by claim.

### i.   Negligence Claims

Plaintiffs appear to allege, against both PMI Holdings and PPI, claims for negligence, gross negligence, and negligence per se. PMI Holdings and PPI are not identified by name in any of the allegations pertaining to negligence. However, in the "Parties" section of the Complaint, Plaintiffs define two groups of defendants against which the Complaint then makes various

---

[23] Plaintiffs request, in the event the Court finds personal jurisdiction lacking, an opportunity to conduct jurisdictional discovery. This request is denied. "[D]iscovery on matters of personal jurisdiction . . . need not be permitted unless the motion to dismiss raises issues of fact." *Kelly*, 213 F.3d at 855 (quoting *Wyatt v. Kaplan*, 686 F.2d 276, 284 (5th Cir. 1982)). Here, Plaintiffs have not put forth any evidence, or even argument, that contests the evidence presented by PMI Comercio regarding its lack of jurisdictional contacts. In *Kelly*, the Fifth Circuit reviewed the district court's decision to deny jurisdictional discovery under circumstances very similar to those here. The Fifth Circuit affirmed the denial of the request for additional discovery to support an alter ego theory of personal jurisdiction because the defendant corporations submitted declarations that "negate the possibility that . . . [they] are the alter egos of Shell Oil Company" and "[the plaintiffs] offer[ed] no basis whatsoever to support an inference that those corporate representatives' deposition testimony would contradict their sworn declarations." *Id.* at 857. Such is this case here. "When the lack of personal jurisdiction is clear," as it is here, "discovery would serve no purpose and should not be permitted." *Id.* at 855 (quoting *Wyatt*, 686 F.2d at 284).

collective allegations of negligence. The term "PMI" (or "PMI defendants") refers to PMI Holdings and three additional entities.[24] Fourth Am. Compl. ¶ 28. The term "Pemex" (or "Pemex defendants") refers to four other entities.[25] Fourth Am. Compl. ¶ 44. Neither group includes PPI. Nearly all the factual allegations concerning negligence are directed at the "Pemex defendants." *See, e.g.*, *id.* at ¶¶ 74, 103(a)-(k), 104. In paragraphs 135 and 136, however, Plaintiffs make the following negligence allegations against both "Pemex and the PMI defendants":

> 135.    Negligence: . . . PeMex and the PMI defendants are responsible for the:
>
> A. Design;
> B. Maintenance;
> C. Inspection;
> D. Operation;
> E. Engineering;
> F. Repair;
> G. Monitoring and detection of gas escapes, pressure, both low pressure and high pressure;
> H. Safety, including ensuring that the operating systems function correctly, that the safety systems, including the monitoring and detection systems operate correctly, that there is no malfunction or rupture or structural weakness or loss of integrity, resulting from any equipment failure or personnel mistake;
> I. Failure to provide temperature readings and liquid levels, failure to alert operating personnel of drops in liquid levels resultant overheating and equipment failures, including holes in the flame tube, corrosion of the piping and separators and associated equipment.
>
> 136.    PeMex, and PMI., along with those responsible for various valves, safety equipment, or safety systems that together or separately failed caused and/or failed to prevent or warn of the impending catastrophic release of gas, explosion and fireball that consumed the plant resulting in numerous deaths, burns and severe injuries and losses.

*Id.* at ¶¶ 135-36.

These allegations are not sufficient to make out a negligence claim against PMI Holdings.

Plaintiffs do not in any way distinguish the alleged actions of PMI Holdings from the actions of

---

[24] The three other entities are PMI Comercio, "P.M.I Holdings Inc.," and "P.M.I. Inc." Fourth Am. Compl. ¶ 28.

[25] The four entities defined as "Pemex" are "Pemex Exploration and Production, Pemex Refining, PeMex Petrochemicals[,] and Pemex Gas and Basic Petro Chemicals." Fourth Am. Compl. ¶ 44. (These are the entities that the Court has referred to as the "Pemex Subsidiaries.").

the other "PMI defendants," nor do the allegations even delineate between the actions of the "PMI defendants" and the actions of the "Pemex defendants." Plaintiffs simply lump together eight distinct corporate entities. As the Court discussed in its prior Order, lumping together multiple defendants without identifying who is responsible for which acts does not satisfy the requirements of Rules 8(a)(2) and 12(b)(6). *See* Mem. & Order, June 22, 2015, at 12 ("At a minimum, Plaintiffs should endeavor to explain what role each Defendant played in the plant, rather than grouping them together at all times."). Even if the above allegations were asserted solely against PMI Holdings, they would still fail to state a claim because they consist merely of "'labels and conclusions'" and "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555-57). Therefore, the claims against PMI Holdings for negligence, gross negligence, and negligence per se[26] must be dismissed. As for PPI, because the Complaint does not make any negligence allegations against it—not even by way of group pleading—the claims against it for negligence, gross negligence, and negligence per se are likewise dismissed.[27]

ii.     Strict Products Liability

The Complaint does not allege facts against PMI Holdings or PPI sufficient to make out a claim for strict products liability. *See Lucas v. Texas Indus., Inc.*, 696 S.W.2d 372, 377 (Tex. 1984) ("In order to recover under a theory of strict liability a plaintiff must establish '(1) the defective and unreasonably dangerous condition of the defendant's product and (2) a causal

---

[26] The negligence per se claims must also be dismissed due to Plaintiffs' failure to cite any penal statute that was allegedly violated, a deficiency discussed at length above. *See supra* p. 11-13.

[27] Plaintiffs suggest that the Complaint's alter ego allegations are sufficient to maintain negligence claims against PMI Holdings and PPI on the basis of acts perpetrated by other Pemex corporations. For the reasons discussed above, *see supra* p. 27-29, Plaintiffs' allegations are not adequate to support an alter ego theory of liability.

connection between such condition and the plaintiff's injuries or damages.'" (quoting *Armstrong Rubber Company v. Urquidez*, 570 S.W.2d 374, 376 (Tex. 1978))). The Complaint's allegations pertaining to the products liability claims are all stated against defendants other than PMI Holdings or PPI.[28] *See, e.g.*, Fourth Am. Compl. ¶¶ 52, 92, 94, 109, 112, 118, 137-139. Therefore, as to PMI Holdings and PPI, Plaintiffs' claim for strict products liability is dismissed.

### iii.    Breach of Quiet Enjoyment

The parties dispute whether PMI Holdings and PPI are even among the defendants against whom Plaintiffs bring the claim for breach of quiet enjoyment. The Court agrees with PMI Holdings and PPI that this claim is not asserted against them. The Complaint specifies precisely which defendants allegedly breached Plaintiffs' right to quiet enjoyment. *See* Fourth Am. Compl. ¶ 151 ("The PeMex plant owner and operator and the pipeline Defendants,' more specifically, Kinder Morgan Gas Natural de Mexico, Kinder Morgan, Inc., Kinder Morgan Energy Partners, LP, Kinder Morgan Management LLC, El Paso Pipeline Partners, LP, El Paso Pipeline GP Company LLC, Tennessee Pipeline Inc., Tennessee Pipeline Partners, Inc."). PMI Holdings and PPI are not included in this list. Nor do the factual allegations of the Complaint make out a claim for breach of quiet enjoyment against PMI Holdings and PPI. Therefore, as to PMI Holdings and PPI, the claim for breach of quiet enjoyment is dismissed.

### 4.    Motion to Dismiss by Honeywell

Defendant Honeywell moves to dismiss, pursuant to Rules 8(a)(2) and 12(b)(6), for failure to state a claim.

---

[28] It is not even clear whether the products liability claims are asserted against PMI Holdings and PPI, as the paragraph that names "products liability" as a cause of action, *see* Fourth Am. Compl. ¶ 134, references only the "PeMex defendants, . . . Draeger, Honeywell Analytics, I & C, and Firebus," as well as one defined group of defendants, the "Monitoring Defendants," which does not include PMI Holdings or PPI, *see id.* at ¶ 91.

### a.    *Strict Products Liability*

Plaintiffs bring a products liability claim against Honeywell on the basis of an "original operating system"—also referred to as a "Total Plant Solutions" ("TPS") system—that was allegedly manufactured by Honeywell and installed in the refinery plant.[29] Fourth Am. Compl. ¶¶ 52, 92, 146. "The TPS system was supposed to allow the plant operators to monitor the gas delivery, metering, processing and separation of gas, condensate and water, along with the metering at the sale point." *Id.* ¶ 118. The Complaint alleges that the TPS system "that failed, was defectively designed, manufactured and marketed," and that "[t]he product defect and negligence of Honeywell in these manners was the proximate and producing cause of Plaintiffs' damages." *Id.* at ¶ 52. Because the Complaint makes reference to all three theories of product liability—design defect, manufacturing defect, and marketing defect—the Court will review the sufficiency of the pleadings separately as to each theory of liability. *See generally American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 426-35 (Tex. 1997).

### i.    Design Defect

To state a claim for design defect, a plaintiff must allege that "(1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery." *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009). Plaintiffs have not alleged that the TPS system's design was unreasonably dangerous, nor have they alleged that a

---

[29] In addition to the TPS system, the Complaint also makes vague reference to "detectors or monitoring equipment" that the "Monitoring Defendants" provided to Pemex, which failed to "alert Pemex and the Plaintiffs of the dangerous conditions that lead [sic] to the explosion." Fourth Am. Compl. ¶ 91. Honeywell is one of the "Monitoring Defendants." *Id.* The allegations concerning "detectors or monitoring equipment" provided by the "Monitoring Defendants" cannot form the basis of a products liability claim against Honeywell because Plaintiffs never identify any specific product that was allegedly manufactured by Honeywell.

safer alternative design existed. Because Plaintiffs have failed to plead these requisite elements of a design defect claim, the claim must be dismissed.

### ii.    Manufacturing Defect

To state a claim for manufacturing defect, a plaintiff must allege (1) that the "product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous"; (2) "that the product was defective when it left the hands of the manufacturer"; and (3) "that the defect was a producing cause of the plaintiff's injuries." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). The Complaint fails to allege that the TPS system deviated in any way from its design specifications. Also absent is an allegation that the alleged defect was present at the time the TPS system left the manufacturer. Plaintiffs' failure to plead these elements of a manufacturing defect claim requires that the claim be dismissed.

### iii.    Marketing Defect

To state a claim for marketing defect, a plaintiff must allege that:

(1) a risk of harm is inherent in the product or may arise from the intended or reasonably anticipated use of the product, (2) the product supplier actually knew or should have reasonably foreseen the risk of harm at the time the product was marketed, (3) the product possessed a marketing defect, (4) the absence of the warning or instructions rendered the product unreasonably dangerous to the ultimate user or consumer of the product, and (5) the failure to warn or instruct constituted a causative nexus in the product user's injury.

*DeGrate v. Executive Imprints, Inc.*, 261 S.W.3d 402, 411 (Tex. App. 2008). Several of these elements are not pled in the Complaint. Plaintiffs have failed to allege that there was a risk of harm inherent in the TPS system, that Honeywell knew or should have foreseen this risk, and that the absence of warnings rendered the system unreasonably dangerous. Therefore, like the other product liability claims, the claim for marketing defect must be dismissed.

b.    *Negligence and Gross Negligence*

As mentioned previously, a plaintiff must plead three elements to make out a claim for negligence: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) damages proximately caused by the breach. *Federal Deposit Insurance Corp.*, 967 F.2d at 170. Plaintiffs allege that Honeywell, along with the other "Monitoring Defendants," served as a member of the "Technical Committee" which "developed protocols adopted by PeMex and the PeMex entities for the prevention of gas explosions and fires, including preventing the escape of gas, such as occurred at the Gas Processing Plant outside Reynosa."[30] Fourth Am. Compl. ¶¶ 46, 52; *see also id.* at ¶ 91 ("Defendants Draeger, FireBus, I&C and Honeywell (hereinafter 'Monitoring Defendants') provided technical advice to PeMex and its subsidiaries, to prevent gas explosions and fires, and detectors or monitoring equipment to determine the amount of explosive gas, smoke, fire and temperature at said plant."). Plaintiffs claim that the "Monitoring Defendants" were "negligent in failing to discover the diversion of gas, water and condensate and the fact there were changes in the amounts of product being metered." *Id.*

Plaintiffs' allegations fail to state a claim against Honeywell for negligence or gross negligence. As a preliminary matter, Plaintiffs have not clarified the individual roles of the various "Monitoring Defendants." The Complaint's "failure to distinguish between the so-called 'Monitoring Defendants' [remains] fatal." Mem. & Order, June 22, 2015, at 12. Second, even assuming that the allegations are sufficient to allege a duty on the part of Honeywell, Plaintiffs have not stated a plausible, non-conclusory allegation as to breach. The Complaint does not allege any action by Honeywell that would have constituted a breach of the alleged duty. The

---

[30] According to the Complaint, the full name of this committee is the "Normalization Committee of Petroleous Mexicanos and Subsidiary Organizations: Technical Committee for the Exploration and Production of PeMex; System for Gas Detection and Alarms." *Id.* ¶ 46.

only fact alleged in support of the element of breach is the explosion itself, but this is not sufficient. The Court cannot infer breach, much less proximate causation, from the fact of injury alone. Accordingly, Plaintiffs' claims against Honeywell for negligence and gross negligence are dismissed.

c.    *Negligence Per Se*

The Complaint's only allegation of negligence per se against Honeywell is directed at all "Defendants." Fourth Am. Compl. ¶ 148. This allegation does not cite any penal statute that Honeywell allegedly violated, but rather lists various administrative agencies and industry associations whose "rules and regulations" Defendants purportedly failed to follow. *Id.* For the reasons discussed *supra* p. 11-13, such a pleading fails to make out a claim for negligence per se. Accordingly, Plaintiffs' negligence per se claim against Honeywell is dismissed.

d.    *Claims for "Knowledge of Outside Action" and Breach of Quiet Enjoyment*

Plaintiffs concede that their claims for "knowledge of outside action" and for breach of quiet enjoyment are not directed against Honeywell, but rather solely against the Pemex Defendants. Pls.' Resp. Mot. Dismiss 3 (Doc. No. 148). Because these claims are not asserted against Honeywell, Honeywell's Motion to Dismiss, as to these claims, is denied as moot.

**5.    Motion to Dismiss by Draeger**

Defendant Draeger moves to dismiss, pursuant to Rules 8(a)(2) and 12(b)(6), for failure to state a claim. Draeger is listed in the Complaint, like Honeywell, as one of the "Monitoring Defendants." The claims against Draeger for negligence, gross negligence, and negligence *per se* suffer from the same deficiencies as those present in the negligence claims against Honeywell, discussed *supra* p. 35-36, and thus must be dismissed.

With respect to products liability, the claim against Draeger is even weaker than that asserted against Honeywell, as Plaintiffs are unable to identify a specific product that Draeger allegedly supplied. Plaintiffs argue that the Complaint ties Draeger to a defective product by its allegation that the "Monitoring Defendants" provided the refinery with "detectors or monitoring equipment" that failed to "alert Pemex and the Plaintiffs of the dangerous conditions that lead to the explosion." Fourth Am. Compl. ¶ 91. But this allegation fails to indicate which of the four "Monitoring Defendants" is allegedly responsible for the defective product and likewise fails to indicate with any specificity what the allegedly defective product was. *See infra* n. 38-39. The few other allegations pertaining to Draeger and a defective product are stated in similarly vague, generic, and collective terms. *See id.* ¶ 120 ("At no time did the various the [sic] safety equipment and process of Defendants, Draeger, Firebus, Honeywell, IC or Emerson provide any warning of the release, eminent release or dangers of the release of explosive gas[.]"); *id.* ¶ 121 ("Honeywell, Emerson, Draeger, Firebus and PeMex failed to ensure the systems were in good and workmanlike order, that no defect was resulting in an explosive condition, that the gas was being properly monitored and metered and that the plant was operating as designed."). Such allegations cannot support a claim under any theory of products liability. Accordingly, the products liability claim against Draeger is dismissed.

### 6.    Motion to Dismiss by Defendant Rotork Controls Inc.

In the June 2015 Order, the Court granted Rotork USA's motion to dismiss the Second Amended Complaint because the collective pleading style failed to give Rotork USA fair notice of the allegations against it. Mem. & Order, June 22, 2015, at 11-12. Plaintiffs have failed to cure this deficiency in their pleadings. The Fourth Amended Complaint continues to lump together multiple defendants—and, in many instances, all defendants—while providing insufficient

factual basis on which to distinguish the individual defendant's conduct. *See, e.g.*, Fourth Am. Compl. ¶ 60 ("[The deficient] valve is installed and serviced, and technical support is provided by Rotork Control, Inc. or Remoter [sic] Control, Inc. along with the Mexican subsidiary, Rotork Servo Controles de Mexico Sa deCV. Technical support is supplied along with maintenance and repair services out of the Houston Rotork office either through Rotork Control, Inc. or Rotork Houston a division of Rotork Control, Inc,, Remote Control, Inc., or Rotork UK LTD."); *id.* ¶ 150 ("Defendants had notice of these possibilities [of criminal activity] and owed a duty to Plaintiffs and those in the surrounding areas . . . ."); *id.* ¶ 148 ("Defendants also failed to meet industry standards for the installation, maintenance or monitoring of relieve valves, safety valves[,] the alarm system[,] and the control, monitoring and operation of those systems."). Because the Complaint fails to distinguish the actions of Rotork USA from those of the many other defendants named in the Complaint, Plaintiffs have failed to satisfy the pleading requirements of Rules 8(a)(2) and 12(b)(6), and, accordingly, the claims against Rotork USA must be dismissed. *See Hinojosa v. Livingston*, 807 F.3d 657, 684 (5th Cir. 2015) ("When the plaintiff's complaint uses blanket terms covering all the defendants, by lumping them together . . ., these allegations are properly disregarded[.]"); *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) ("Given the complaint's use of either the collective term 'Defendants' or a list of the defendants named individually but with no distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular . . . acts they are alleged to have committed.").

Even if Plaintiffs had properly distinguished the alleged actions of Rotork USA from the actions of the other Defendants, the allegations against Rotork USA would still be deficient because Plaintiffs fail to identify the allegedly defective instrument in the refinery for which

Rotork USA is allegedly responsible. The Complaint asserts that "[t]he Rotork or Remote Control Defendants provided, installed, serviced, warranted and inspected a safety or relief valve," Fourth Am. Compl. ¶ 59, which failed "to close off the flow of gas which fed the explosion and fire," *id.* ¶ 94, and which "was defectively designed, manufactured, and/or marketed," *id.* ¶ 59. The Complaint refers to this valve only as the "Valvula de Corteo Rapido," *id.*, a term which roughly translates to "quick shut-off valve." *See* Def.'s Mot. Dismiss 4 (Doc. No. 77). This is a generic term, not an identifiable Rotork USA product. The term could refer to any one of hundreds of valves on the refinery site. *Id.* Plaintiffs do not provide a product identification number, a description of the valve, the valve's location in the refinery, or any other information that could aid Rotork USA in determining whether one of its products was involved in the refinery explosion.[31] Because the Complaint fails to give Rotork USA fair notice of what product is at issue, the claims against it must be dismissed. *See Campbell v. ABB Inc.*, No. 4:14CV01489 AGF, 2015 WL 1006388, at *2 (E.D. Mo. Mar. 5, 2015) (dismissing complaint that "fails to identify any specific products manufactured by the moving Defendants, nor alleges in any fashion whatsoever the time, manner or degree of exposure [that the plaintiff] had to any products produced by the moving Defendants."); *Thorpe Design, Inc. v. Viking Corp.*, No. 15-CV-03324-EDL, 2015 WL 5440792, at *2 (N.D. Cal. Sept. 15, 2015) (granting motion to dismiss product liability and negligence claims where "the complaint is overly vague as to what product is at issue."); *Thompson v. DePuy Orthopaedics, Inc.*, No. 1:13-CV-00602, 2014 WL 2874268, at *3 (S.D. Ohio June 24, 2014) ("At a minimum, the district courts have required allegations that the defendant manufactured the product, that the product was used by the

---

[31] Both the Third Amended Complaint and the Fourth Amended Complaint state that the valve is "depicted in Exhibit A." Fourth Am. Compl. ¶ 109; Third Am. Compl. ¶ 103. But no exhibits were attached to either pleading.

plaintiff, that the product failed while being used by the plaintiff, and that the portion of the product that failed could be identified and is so identified in the complaint.").

### 7.      Motion to Dismiss by Emerson Electric

Defendant Emerson Electric argues that the claims against it are barred by the statute of limitations. Def.'s Mot. Dismiss 15-16 (Doc. No. 138). The Court agrees.

As the Court has previously held, the two-year statute of limitations governing the personal injury claims in this action expired on September 18, 2014. Mem. & Order, June 22, 2015, at 13 n.9. Plaintiffs filed claims against Emerson Electric for the first time on July 16, 2015 in their Third Amended Complaint. Plaintiffs do not dispute that their personal injury claims are time-barred. Pls.' Resp. Mot. Dismiss 16 (Doc. No. 145). The only claim that Plaintiffs contend was timely filed is the claim for breach of implied warranty, which, as discussed *supra* p. 9, carries a four-year statute of limitations. *See* Pls.' Resp. Mot. Dismiss 16 (Doc. No. 145). Although the breach of implied warranty claim may have been timely filed, the claim nevertheless must be dismissed due to Plaintiffs' failure, discussed at length above, to comply with the statutory notice requirement of TEX. BUS. & COM. CODE § 2.607(c)(1). *See supra* p. 5-6; Pls.' Resp. Mot. Dismiss 16 (Doc. No. 145) (admitting that "Plaintiffs did not give Emerson Electric pre-suit notice."). Accordingly, Plaintiffs' claims against Emerson Electric are dismissed with prejudice.[32]

---

[32] Because the claims against Emerson Electric are barred by the statute of limitations and the statutory notice requirement, the Court does not reach the issue of whether personal jurisdiction may be asserted over Emerson Electric.

40

## V.      CONCLUSION

For the reasons set forth above, the Court rules as follows:

The Motion to Dismiss by Rotork Controls Inc. ("Rotork USA") (Doc. No. 131) is **GRANTED**. All claims against Rotork USA are **DISMISSED WITH PREJUDICE**.

The Motion to Dismiss by Kinder Morgan Gas Natural de Mexico, Kinder Morgan Inc., Kinder Morgan Energy Partners L.P., Kinder Morgan Management LLC, El Paso Pipeline Partners, LP, El Paso Pipeline GP Company, LLC, Tennessee Pipeline Inc., and Tennessee Pipeline Partners, Inc. (collectively, "Kinder Morgan") (Doc. No. 137) is **GRANTED IN PART AND DENIED IN PART**. The claims for negligence *per se* and for breach of quiet enjoyment are **DISMISSED WITH PREJUDICE**. The claims for negligence and gross negligence remain.

The Motion to Dismiss by P.M.I. Comercio Internacional, S.A. de C.V. ("PMI Comercio"), P.M.I. Holdings North America, Inc. ("PMI Holdings"), and PEMEX Procurement International, Inc. ("PPI") (Doc. No. 135) is **GRANTED**. All claims against them are **DISMISSED WITH PREJUDICE**.

The Motion to Dismiss by Emerson Electric Co. ("Emerson Electric") (Doc. No. 138) is **GRANTED**. All claims against it are **DISMISSED WITH PREJUDICE**.

The Motion to Dismiss by Draeger Safety Inc. ("Draeger") (Doc. No. 139) is **GRANTED**. All claims against it are **DISMISSED WITH PREJUDICE**.

The Motion to Dismiss by Honeywell Analytics Inc. ("Honeywell") (Doc. No. 141-142) is **GRANTED**. All claims against it are **DISMISSED WITH PREJUDICE**.

The Motion to Dismiss by Petróleos Mexicanos ("Pemex"), Pemex Exploración y Producción ("PEP"), and Pemex Transformación Industrial, as successor-in-interest  to Pemex Refinación ("PXR"), Pemex Gas y Petroquímica Básica ("PGPB"), and Pemex Petroquímica

("PPQ") (collectively, "Pemex Defendants") (Doc. No. 160) is **GRANTED**. All claims against the Pemex Defendants are **DISMISSED WITH PREJUDICE**.

The decision that dismissal be with prejudice is based on the Court's conclusion that, after five bites at the apple, Plaintiffs have stated their best possible case. As the Fifth Circuit has instructed, "[a]t some point a court must decide that a plaintiff has had fair opportunity to make his case; if, after that time, a cause of action has not been established, the court should finally dismiss the suit." *Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986). The Court believes that permitting a sixth pleading attempt would be an inefficient use of the parties' resources, would cause unnecessary delay, and would be futile. *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 567 (5th Cir. 2003). Accordingly, except for the negligence and gross negligence claims asserted against Defendant Kinder Morgan, Plaintiffs' claims are hereby dismissed with prejudice.

The Court is fully sensitive to the tragedy that is at the heart of this litigation. The injured employees, their families, and the families of the deceased have the Court's utmost sympathy. But, even when—perhaps, especially when—the facts speak of tragedy, the law cannot be made to conform so as to fit the facts.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 13th day of July, 2016.

HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE